on on camera. So with that, Madam Clerk, would you please call the first case? In re Reno City Center Owner LLC, Brian Davidoff appearing for Appellants, Brian Levy appearing for Appley. All right, good morning. Mr. Davidoff, would you like to reserve any time? I would, Your Honor. I'd like to reserve three minutes at the end. All right, very good. Please begin. Thank you, Your Honors. Good morning. I'm here, obviously, for Christopher Bevor and the related appellant parties. I certainly acknowledge what Your Honor is saying that to focus on specific issues. What I'd like to begin with, Your Honors, is context is relevant in any decision, and so I'd like to spend a couple minutes regarding the facts leading up to the dismissal order. What we know is that at the time of the bankruptcy filing, the debtor schedules this real estate asset at $153 million. That value is never challenged by Delphi. It's never challenged by anyone in the bankruptcy case, not even in Delphi's motion for relief from stay. Delphi itself files a proof of claim for $106 million. My clients collectively file claims which aggregate approximately $80 million. Those claims are objected to. No objections are ultimately resolved by the bankruptcy court, although there was a hearing at least on one of the objections, but none of them were ultimately resolved by the bankruptcy court. My client, Mr. Bevor, individually, the appellant had guaranteed the Delphi debt. The debtor made three attempts to get a plan confirmed, an initial plan, an amended plan, and a second amended plan. They could not get those plans across the French line. After lots of litigation, the appellants are able to obtain termination of exclusivity. They file a plan, and critically here in this case, Your Honor, because I think that this is a feature of much of our argument, is that we believe that the appellant's plan provided a potentially viable path to this case. We offered $7.5 million more to Delphi. We offered to pay unsecured creditors $0.95 on the dollar on confirmation versus the debtor's plan, which was going to provide them $500,000 over a number of years. And also, very importantly, the appellant's plan was going to provide a means to resolution of what generated this entire bankruptcy case, which was the dispute over management that the Griffin members had purported to remove Mr. Bevor and his companies as the manager. So the appellant's plan was going to provide all those things. It provided a potentially viable alternative. So when the debtor couldn't get their plan confirmed, they bring their dismissal motion, and the dismissal is predicated on this Madison refinance. And Your Honors are aware that the Madison refinance is to be used in three parts. One is to pay the balance of the money due to Delphi, and as a senior secured creditor, we can't object and don't object to that. Then some amount of money, $835,000, is to pay administrative claims. We think correctly, although those claims can be paid, there should have been an opportunity to object. That was not afforded to any parties. But most critically, there's this handful, 18 claims, that are attached to an exhibit to the dismissal motion, which they say, those are the only general unsecured claims that they're going to pay. They're going to leave us out. And those 18 claims, they say actually, when you look at the exhibit, the exhibit indicates some of them are subject to further negotiation. They aggregate $2.2 million versus the $80 million of objective claims that my clients had filed. And then critically, the dismissal motion says, specifically, I'm going to read just a couple lines from it. If the bankruptcy case is dismissed, the debtor will consummate the refinance transaction with Madison Capital. What is more, upon the closing of the refinance transaction, the debtor will pay the Chapter 11 administrative expenses and allow general unsecured claims. That's baked into the motion. And the motion then also provides that the Griffin members would be revested with their equity interests. We obviously oppose that. We say it violates JVIC. We say it's a sub-ROSA plan. We say that the case has been prosecuted for the benefit of the Griffin members. Bankruptcy court overrules all of it. Mr. David, but you didn't appeal that order, did you? Which part, Your Honor? The order approving the settlement. No, we did not. We did not. But obviously, a settlement—the issue that we have, Your Honor, is simply the dismissal. The dismissal incorporated the settlement. But the settlement— As for the dismissal, on that part, I didn't see that you objected. You didn't say that—you didn't raise an argument that there was no cause. You're just raising the JVIC argument. That is correct. We don't challenge the bankruptcy court had authority to dismiss the case in its discretion. But we do challenge the way it was dismissed, that it violated JVIC. And, Your Honor, to your question, yes, it is correct that we did not object to the dismissal. Excuse me, the settlement. The settlement was with Delphi. We objected to it, but we didn't appeal it. That is correct. But that issue is distinct from this Madison refinance transaction and the dismissal motion. Critically, the dismissal order specifically says it is hereby ordered the motion is granted. It doesn't say it's granted in part and denied in part. It just says it's granted. And then it goes on to say that the debtor is authorized and empowered to do and perform all acts necessary to implement the refinance transaction. The dismissal order implicitly, if not explicitly, incorporates the Madison refinance transaction. And that's an integrated transaction. That transaction says Delphi is going to get paid. The unsecured credits is going to get paid. The administrative claims are going to get paid. And that's what the dismissal order does. So with the case dismissed and the debtor authorized and empowered, doesn't say the party has the absolute right to do that, but authorized and empowered, wouldn't you have an ability to challenge or raise issues in state court? Your Honor, the transaction has been approved by the bankruptcy court. It says that the debtor is authorized and empowered to do that. The fact that the bankruptcy judge doesn't say, I'm not approving the interest rate or I'm not approving the specific terms of the loan. That to us is not relevant to the dismissal. But the details. You think it's a distinction. There's not a distinction between what the court did and if the court had said they shall do it. Authorizing to empower, you say, in essence, would be equivalent to the bankruptcy court saying, you shall do this. That is correct, Your Honor, for two reasons. One is that the dismissal order specifically incorporated the entire dismissal motion. Again, it granted that motion, not in part. It didn't deny it in part. It granted the entire motion and it then authorized and empowered the debtor to carry out a transaction that when you look at it, it is an integrated transaction. It didn't say that we're only authorized and empowering the payment of the senior creditor. So, Mr. Davidoff, could the order be fixed? Let's say we remanded it. We vacated it and remanded it because it wasn't consistent with Javik. Could the bankruptcy court fix the order by just saying the motion is granted in part and I'm not requiring any of these actions. You can do what you want with this money and this, you know, the Madison refinancing. Would that make it okay? Your Honor, I think that the court here should have done what the court in Portimore did and I know you were on the panel on that court. The court should have rejected it. The court wasn't there to rewrite the transaction for the parties. There was a transaction presented to the bankruptcy court that proposed a certain methodology. It either complied with Javik or it didn't. And I think that what the alternatives for the court were is to say, okay, if you're going to do it this way, I can't do it this way, but not if I'm going to allow you to undo this, to kind of take part of the transaction, pay the senior secured credit, but not pay anybody else because that wasn't presented to the court. Now, if it was reversed and remanded with that instruction, I suppose then the parties could figure out, go back into the bankruptcy court and figure out whether Madison's willing to do a deal under those circumstances. I don't know. We would have to revisit that. So Delphi's been paid off? Delphi's, I believe, well, I believe that yes, the payment was made and I believe that Delphi's removed its lien on the property. And what about all the other people? Maybe we don't know what's happened with the rest of the terms of what they were going to do after the case was dismissed. I'm just wondering, can that egg be unscrambled? And Your Honor, I anticipated that question. We believe that it can be unscrambled. Number one is, again, we don't challenge the Delphi part, okay? With regard to the unsecured creditors, to the extent they have been paid and they were impaid properly, that money can be clawed back. I mean, bankruptcy courts claw back money on a regular basis. We're talking about 18 creditors of $2.2 million. And to the extent that we are right that, and the court agrees that the revesting of the equity in the Griffin members was inappropriate when a particular group of creditors weren't paid and others were, certainly that can be recovered as well. So, we think the egg can be unscrambled. It is not too complex not to be unscrambled. So, Your Honor, I guess within the time that I have, I just want to focus, if I can, on the Poudamore decision. Appellees rely on that case for their position. But when you look at what the bankruptcy court did in Poudamore, the bankruptcy court actually had very similar facts to what we have, which is that the debtor in that case proposed two alternatives. The one being, I'll pay certain creditors and not others. The other one being, I'll pay other creditors and then we'll have a reserve for the objecting creditor. And the bankruptcy court rejected both of those. And then Your Honor on the back said, okay, when the bankruptcy court ultimately having rejected both those alternatives and entered a plain vanilla dismissal order, that's all it said, case is dismissed. That was okay and that was affirmed by the bankruptcy appellate panel. So, we get it, Your Honor. But that is exactly the opposite of what the bankruptcy court did in this case. And Your Honor, unless you have any questions, I'll rest at that. Questions? No. All right. Thank you, Mr. Davidoff. Mr. Levy, we are ready for you. Good morning, Your Honors. Brian Levy on behalf of the appellees. Let me start with standing, Your Honors. Not addressed by Mr. Davidoff, but it's a threshold issue that he is the burden of proof on. There is no standing for the appellants in this case. They did not suffer an injury. They do not have an injury that's addressable by this court. They are not persons aggrieved. The three examples that they provide in their reply brief all go to show why they don't have standing. The first complaint they have is that the plan might have been confirmed. That theoretically, hypothetically, conjecturally, this plan could have been confirmed. The East Coast Foods case says a conjectural injury is not sufficient to confer standing. The two specific points that they raise with respect to the items included in that plan, the disputed management question. The disputed management question largely involves the grandfather of the debtor, the grandparent entity of the debtor. The debtor is not a party to the pre-petition arbitration that was commenced prior to the bankruptcy, was ongoing during the bankruptcy, and remains ongoing today. That is resolvable outside of bankruptcy. There's no reason to go back into bankruptcy to resolve the management question. The last argument they raise on standing is resolution of the Beaver Guarantees. As Judge Corbett aptly noted, the liability of the Beaver Guarantees, the deficiency amount of Delphi's claim, was fixed by the settlement agreement. That order approving the settlement agreement was not appealed. That is a fixed finite number that was decided before the dismissal, that was not impacted by the dismissal. The fact that the appellants somehow, in an unexplained way, would have gotten an additional $7.5 million to offer to Delphi, that is still a possibility for them now. They can go to Delphi now and negotiate $7.5 million for release of any liability on the Guarantees. None of those injuries are redressable in bankruptcy if the court was to overturn the order. Essentially, what they're trying to do is they are essentially trying to force an involuntary bankruptcy at this point. The debtor didn't want to be in bankruptcy. The debtor no longer wanted to confirm a plan. They are trying to force the debtor into an involuntary bankruptcy, and they are not eligible to be petitioning creditors in an involuntary bankruptcy. Their claims are all contingent as to liability, and they're subject to both bonafide dispute as to liability and amount. For those reasons, the appellants lack standing. Moving on to the JEVIC issues, there's a tremendous disconnect between what the dismissal order actually says and what the appellants say the dismissal order says. There's also a disconnect between how the appellants characterize the Porta Mayor dismissal order and the dismissal order in this case. I think if the reads those two dismissal orders, the dismissal order from the bankruptcy court in Porta Mayor and the dismissal order from the bankruptcy court in this case, they're on all fours with each other. This characterization of a distribution of equity interest to the Griffin members is grossly mischaracterized. Couldn't you see this as a kind of wink-wink, nudge-nudge? We're just dismissing it, but we're going to do all of these things, and the bankruptcy court is blessing it by authorizing and empowering. It's not just a straight dismissal in that sense. You're trying to thread a needle here of getting a dismissal while satisfying the requirements of Madison, the funder. One feature of this order that's different from the Porta Mayor order is that this order specifically incorporated the bankruptcy court's oral findings effect. We can look to what the court ruled orally and consider that as part of the ruling in this case. That was done just for insurance purposes. That was to satisfy the title insurance company that this thing could close, that there was no interference from the bankruptcy to prevent this from closing. If you read the dismissal order, there's absolutely no direction to pay any creditor, even Delphi. There's no direction to pay Delphi. The court was not endorsing any of the payments, and that's the same in Porta Mayor. The court in Porta Mayor, and Judge Brain, you're on the appellate panel for this. Help me understand the difference between empower and order. Empower says you can do it if you'd like to do it, and order says you have to do it. What we're saying, Your Honor, is that here there was a dismissal, and then the financial affairs, just like any entity that's not in bankruptcy, it was not subject to the oversight by the bankruptcy court. It was not subject to the absolute priority rule. It could pay whichever unsecured creditors it chose to pay. In Porta Mayor, the bankruptcy court also had knowledge of the debtor's post-dismissal intentions. Yes, there's discussion in that order where the debtor asked the court to order those payments to be made, and the court said, I'm not going to order those payments to be made, but it had the knowledge that those payments would be made upon the straight dismissal of the case. That's the same thing here. The additional $2.2 million that was to go to unsecured creditors, and the court's knowledge of that before the dismissal order, is no different than the court's knowledge in Porta Mayor. The court also made an important distinction that the bankruptcy code does not impose the same requirements on dismissal as confirmation. We can see that in the different absolute priority rule, the code uses the word distribution. In 349, the code uses the word revest. Congress meant something different between a distribution and revesting. The appellants equate those two provisions and those two terms. Just because the property revested in the debtor once the case was dismissed, doesn't make it a distribution to the managing members of the debtor entity. The whole issue of whether it's the Griffin members or the debtor itself, that's all issues in this arbitration that's still ongoing. Those are non-bankruptcy issues. Importantly, the dismissal in this case, unlike in Jevick, did not provide for a distribution. There was no distribution of assets. It was a dismissal, and the debtor could continue on with its financial affairs as it saw fit post-dismissal. Last argument on this point, your honors. Under the reasoning that the appellants put forth, it would really bar any debtor from ever dismissing a Chapter 11 case unless every single creditor is paid in full. That would include a creditor whose claim is objected to. They would either have to pay in full or consent to the dismissal of the case. That's completely inconsistent with 1112B, which allows for dismissal that's in the best interest of creditors in the estate. There are situations where dismissal is best for all creditors, as the creditor body as a whole. It doesn't have to be what's best for every single creditor, regardless of the validity of their claim. What about Judge Brand's question about remand? What would happen if we remanded and said that the judge, yes, she can dismiss the case, but she shouldn't authorize or empower anything? It should just be straight, plain, case-dismissed order. Good question, your honor. Mr. Davidoff, I've given this some thought, too. I don't know how you want to scramble this egg. Delphi has been paid. Mechanics lien holders have been paid. Unsecured creditors have been paid. This case was dismissed in February. The debtors engaged in new transactions from February to here we are in late October. Did the debtor need to be empowered to do that? Couldn't the debtor have done that just if the order was very straightforward and just said the case dismissed? Couldn't all those things have happened? Yes, all those things could happen with the one caveat of was the title insurance company able to insure without some sort of empowerment-type language? That is really an unknown, but the record is clear that that was the sole reason for including that language in the dismissal order. With respect to the complaint about the unequal treatment of general unsecured creditors, again, this happened in Port Amour. This was the dispute over the use of the funds provided from a non-estate source and the dip account. Let me ask one more question. This may be naïve on me, but if it was remanded and there was an order that just said case dismissed, well, certain things that the debtor has done, does the title insurance company care now? I mean, the things that the title insurance company cared about, we're not unwinding those things. Those have all been done, right? If it's remanded with the instruction from the court to enter a plain vanilla dismissal order at this point. I've always thought vanilla is a complicated flavor myself, but I understand. No sugar. I agree with you that not all vanilla ice cream is the same. I mean, so long as there's no effect on any of the post-petition transactions, if it's just this case is dismissed, then I don't really see an issue there. The concern is if the debtor is pulled back into a bankruptcy that it doesn't want to be in, that the creditors are brought back into a bankruptcy that they agreed to accept less than their full claims. I mean, it's an absolute mess if the bankruptcy is reinstated. Well, but, yeah, okay. Okay. So you're saying to remand, we basically have to reinstate and the dismissal order wouldn't take effect until the new order was entered. Okay. Because it'd reversal and a remand. I think you would have to reverse and remain with specific instructions just to dismiss the case on, I guess, retroactive to February. Honestly, Your Honor, I hadn't really contemplated this scenario. Your Honor, but I don't think we need to get there. I think the U.S. trustee was correct when they didn't identify a GEVIC issue. I think the bankruptcy court was correct when they didn't identify a GEVIC issue. There were no distributions made in this dismissal order. It was a dismissal and the debtor was thereafter free to enter into financial transactions that were not subject to the oversight of the bankruptcy court. They're not subject to the absolute priority rule. They could pick and choose which creditors they wanted to pay. This is no different than Port order in that case. With that, I'll cede the last 37 seconds. This case, I clerked many years ago, the late great judge, Kenneth Treadwell, bankruptcy judge, and he always used to refer to as the highest court in the land being the title insurance company. In essence, that's what we have here is that this in power language, I take it, Mr. Levy, that this didn't really, this was prompted by the title insurance company and not the court. Correct, your honor. I didn't come into this case until the, I came into this case through representation of Madison. So I was not involved in making the sausage on that one, but from reading the transcript, that's my understanding. Thank you. Thank you all for your time. All right. Thank you, Mr. Levy. Mr. Davidoff, I think you have a little bit more than three minutes. Thank you, your honors. First, let me address one of the later comments of Mr. Levy, which is to say that he says that essentially we were trying to act like as though we were creating involuntary bankruptcy. No, not at all. We simply want to ensure what was done was compliant with the regarding what can the court do? I see two paths. The one path is what you asked me, Judge Brand, which is what if you just instructed that the case was remanded, that the dismissal should be without any conditions. I suppose the court could do that. The legal effects are what they are. Whatever the effect is on the title insurance company, it is what it is. Not sure what the fallout is, but I suppose that's one alternative. The other alternative, which we had thought of prior to this hearing, was that we don't challenge the payment to Delphi because they're a senior creditor. We can't challenge that under JVIC. So I'm not sure that that's what we would look to go after. On the other hand, the court could reinstate the bankruptcy case and the payments could be clawed back. Yes, it is true that there is a bankruptcy case that's reopened again. We know that the parties don't want it, but the dismissal did not comply with JVIC. Let me finally address the standing issue. While the appellants relying on East Coast food say that we really weren't injured, we've quoted to the court the Lou Jiang decision, the United States Supreme Court, where it talks about having standing meaning an injury in fact. I believe the points that Mr. Weiss made, that we believe there is a direct injury, is supported not only by the Lou Jiang decision, but actually by JVIC. Because in JVIC, there too, the opposing party said that there was kind of no harm, no foul, that they were going to lose everything if the bankruptcy court didn't approve the dismissal and even after the dismissal that they weren't going to get anything. So kind of no harm, no foul. But the Supreme Court really undermines that and specifically says that the loss of litigating a potentially valuable claim is itself an injury. The court talks about even if the claim might be fruitless, the mere fact that you've lost that opportunity and we lost the opportunity to continue to prosecute our plan of reorganization to try to negotiate what we thought was a better plan of reorganization with Delphi. And finally, as to the standing issue, Your Honor, we quoted truck insurance and the court's very well aware of that. Another United States Supreme Court case where the court really, for standing purposes, really just looks at party and interest. And I think by every definition of the word, my clients were parties in interest, whether because they were guarantors, whether they were providers of services to the debtor, whether because they were a management company of the debtor, they were parties in interest and have standing. Thank you, Your Honor. All right. Thank you very much, both of you, for your good arguments. This matter will be submitted and we will issue a decision promptly. Madam Clerk, would you call the next case?
judges: Brand, Corbit, and Niemann